IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PATRICIA HOLLOWAY,

                 Plaintiff,                           No. 03:13-cv-01787-AC

         v.

CLACKAMAS RIVER WATER, LEE E.                 OPINION & ORDER
MOORE, JR., DEAN MARK PHILLIPS,
KATHERINE KEHOE, BARBARA KEMPER,
CINDI LEWIS-WOLFRAM, MICHAEL
CARDWELL, VANCE VOLYES, LARRY
SOWA, KENNETH HUMBERSTON,
HUGH KALANI, SPECIAL DISTRICTS
ASSOCIATION OF OREGON, FRANK
STRATTON, JENS JENSEN, DOUG
ANDERSON, TAMSEN LEACHMAN,

                 Defendants.

HERNANDEZ, District Judge:

       Magistrate Judge Acosta issued a Findings & Recommendation (#55) on October 2, 2015,

in which he recommends the Court deny Plaintiff's Motion for Leave to File an Amended

Complaint.  Plaintiff has timely filed objections to the Findings & Recommendation.  The matter

1 - OPINION & ORDER

is now before me pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

When any party objects to any portion of the Magistrate Judge's Findings & Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate Judge's report.  28 U.S.C. § 636(b)(1); Dawson v. Marshall, 561 F.3d 930, 932 (9th Cir. 2009); United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

I have carefully considered Plaintiff's objections and I agree with Judge Acosta's conclusion that Plaintiff's motion should be denied.  However, I offer the following discussion to clarify the standard for reviewing the allegations in the proposed pleading, to clarify statements I made in my December 9, 2014 Order, and to address Plaintiff's objections.  Additionally, I have also reviewed the pertinent portions of the record *de novo* and find no other errors in the Magistrate Judge's Findings & Recommendation.

I.  The Allegations in the Proposed Second Amended Complaint (PSAC)

An amended pleading stands or falls on its own.  The proposed pleading must contain all allegations essential to the claims alleged therein.  See Valadez-Lopez v. Chertoff, 656 F.3d 851, 857 (9th Cir. 2011) ("it is well-established that an amended complaint supersedes the original, the latter being treated thereafter as non-existent.") (internal quotation marks omitted).  In determining whether to allow Plaintiff's motion to amend, Judge Acosta erroneously relied on allegations in the prior First Amended Complaint which was previously dismissed and would have no relevance if the filing of the currently-proposed complaint[1] were allowed.  Oct. 2, 2015 F&R at 2 ("the factual background contained in this opinion derives from the allegations

---

[1]  The proposed pleading is the Proposed Second Amended Complaint (PSAC), docketed as Attachment 1 to ECF 49.

2 - OPINION & ORDER

contained in Plaintiff's First Amended Complaint . . . and Proposed [Second] Amended

Complaint.").  Instead, analysis of whether the claims raised and allegations asserted Plaintiff's

PSAC are futile is confined to the PSAC.

     The PSAC is largely unstructured and the allegations and claims are poorly pleaded.

Initially, there is a section identifying the parties[2] and then a section asserting the bases for

jurisdiction (which erroneously cites to 18 U.S.C. § 1983 instead of 42 U.S.C. § 1983).  PSAC at

¶ 2.  Following this, in a section titled "Allegations Common to Counts" and which bears the

number "3," are eleven pages of mostly narrative, not necessarily in chronological order,

containing a significant number of legal conclusions as opposed to facts.  E.g., PSAC at p. 4

("Defendants acted in concert and engaged in a civil conspiracy to commit torts against the

Plaintiff"); at p. 5 ("The decision to cancel liability and legal defense insurance was not

legislative"); at p. 6 ("Defendants . . . . have abused the administrative and judicial processes and

effectively barred Plaintiff of her free speech rights"); at p. 6 ("Plaintiff has standing to seek

damages for the harm caused by the defendants' racketeering activity"); at p. 10 ("Voyles was a

key player in the racketeering activities . . . .").  None of the individual paragraphs of this section

are numbered, lettered, or designated in a fashion conducive to citation or reference.

     Additionally, Plaintiff often refers to "Defendants" or "the conspirators," making it

impossible to discern who actually did what.  E.g., PSAC at p. 8 ("In furtherance of the

conspiracy, defendants negotiated with defendant SDAO . . . ."); at p. 10 ("the conspirators hired

---

    [2]  The section for parties identifies eight individual Defendants as past or current
Clackamas River Water (CRW) Commissioners but fails to allege when each one was a
Commissioner.  This information is not found anywhere in the PSAC.  Because whether any
individual Defendant was a CRW Commissioner at the time of certain alleged conduct is relevant
in this case, omission of these allegations contributes to the futility of the PSAC.

3 - OPINION & ORDER

Defendant Leachman . . . ."); at p. 11 ("<u>Defendants</u> had secretly commenced communication with Leachman . . . ."); at 12 (". . . . fraudulent settlement offers were made by the <u>defendants</u> and <u>conspirators</u> during the pendency of the proceedings . . . ."); at 13 ("<u>defendants</u> made a $40,000 pay-off to Voyles.") (emphases added).

After the "Allegations Common to Counts" section, the PSAC has five separately delineated claims, each bearing a number from four through eight.  PSAC at ¶¶ 4-8.  The first claim, brought under Section 1983, is brought against "All Defendants" and contends that defendants acted under color of state law to deprive Plaintiff of her constitutional right to free speech.  <u>Id.</u> at p. 14.  Plaintiff also raises a municipal liability claim against CRW under <u>Monell v. Dep't of Soc. Servs</u>, 436 U.S. 658, 690-91 (1978), based on her allegations that CRW's chief executive officer and board formulated "the policy."  <u>Id.</u>  Plaintiff does not identify "the policy" other than to assert that the "policies" (now plural), were adopted on an "ad hoc basis in secret meetings of the conspirators" and thus, cannot be characterized as legislative acts.  <u>Id.</u> at pp. 14-15.

The second claim is a malicious prosecution claim against Defendants CRW, Moore, Phillips, Kehoe, Kemper, Lewis, Cardwell, Sowa, Humberston, Kalani, McNeel, and Voyles.  <u>Id.</u> at p. 15.  Plaintiff alleges that Phillips, Moore, Voyles, "and the other defendants" engaged in a civil conspiracy by initiating a complaint against Plaintiff with the Oregon Government Ethics Commission (OGEC); by filing a civil case in Clackamas County Circuit Court; and by initiating employment-related complaints against Plaintiff with the Oregon Bureau of Labor and Industries (BOLI), and in a Clackamas County Circuit Court civil case.  <u>Id.</u>

The third claim is for intentional infliction of emotional distress (IIED).  In the caption,

4 - OPINION & ORDER

Plaintiff fails to identify which Defendants are named. Id. at p. 16. The allegations in support of that claim refer only to "defendants."

The fourth and fifth claims are civil claims under the Racketeer Influenced & Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c), (d). Id. at p. 17. These are brought against all individual Defendants. Id.

Putting aside legal or conclusory allegations, my reading of the PSAC reveals the following allegations in support of the five claims:

(1) In an October 13, 2011 meeting, Kehoe, Kemper, Cardwell, Moore, and Phillips conspired to take actions to cause financial injury to Plaintiff by filing employment-related complaints against Plaintiff, identifying Moore and Voyles as parties to those complaints, and agreeing that Phillips would guide Moore in filing such a complaint; Id. at p. 7.[3]

(2) At some unspecified date, unspecified "defendants" negotiated with Defendant Special Districts Association of Oregon (SDAO) to remove defense coverage for complaints which had been filed against Plaintiff and to increase the deductible for "Employment Practices & Wrongful Acts by Public Officials" from zero to $50,000; Id. at p. 8.

(3) At some unspecified date before October 2011, SDAO allegedly delayed responding to Plaintiff's requests for legal defense, denied legal defense for an appeal, and denied coverage for complaints before insurance coverage was restricted; Id. at p. 9;

---

[3] As part of this allegation, Plaintiff alleges that at this meeting, Kehoe, Kemper, Cardwell, Moore, and Phillips also discussed "the prior actions they and defendants Lewis and Voyles had taken against Plaintiff including, but not limited to criminal complaint . . . OGEC Case, . . . and Clackamas County Civil Case . . . ." Id. at pp. 6-7. Because this refers to a discussion about past conduct, I do not read it as alleging independent actionable conduct unless such conduct is separately pleaded in the PSAC.

5 - OPINION & ORDER

(4) On December 31, 2012, Moore filed a tort claim notice against Plaintiff and "Sterling," whom Plaintiff does not identify in the PSAC, with knowledge that Plaintiff had no insurance for legal defense costs, in retaliation for having engaged in protected speech activity; Id. at p. 9;

(5) On November 7, 2011, Voyles, with Moore's and Phillip's knowledge, filed a BOLI complaint against Plaintiff which was dismissed on February 27, 2013; Id. at p. 10;

(6) At some unspecified point in time, Phillips and Moore "took charge of SDAO negotiations" and notified Plaintiff that SDAO denied coverage; in response to Plaintiff's request that "CRW" indemnify "Plaintiff and Sterling" under Chapter 30 of the Oregon Revised Statutes, unidentified "conspirators" hired Leachman to conduct a "bogus" investigation that rehashed prior criminal, OGEC, and civil complaints filed by unidentified "Defendants" against Plaintiff which had been dismissed or settled in Plaintiff's favor; and unspecified "Defendants" had secretly commenced communication with Leachman in February 2012 to fabricate a fraudulent report which was intended to inflict financial harm against Plaintiff.  Id. at pp. 10-11;

(7) Phillips edited the fraudulent Leachman report before its August 2012 release after which it was posted on the CRW website for nearly twelve months.  Id. at p. 11;

(8) Within seven days of BOLI sending its March 20, 2012 complaint notification letter to Plaintiff, CRW tried to settle the complaint with a "CRW pay-off to Voyles," but not settling as to Plaintiff or Sterling; these were "fraudulent settlement offers" made by "defendants and conspirators"; Id. at p. 12;

(9) In April 2013, in response to a letter from Voyles's attorney threatening to file a civil action of the complaints previously dismissed by BOLI, Humberston and Kalani agreed with

6 - OPINION & ORDER

Moore and Phillips to make a pay-off to Voyles and have Voyles file a civil complaint against Plaintiff; Id. at p. 12;

(10) On May 28, 2013, Voyles filed the civil complaint against Plaintiff and SDAO denied legal defense to Plaintiff; Id. at p. 12;

(11) In June 2014, Sowa, Humberston, and Kalani established a $75,000 risk-management "slush" fund; Id. at p. 13;

(12) On December 1, 2013; Voyles voluntarily dismissed his civil complaint, following which "defendants" made a $40,000 pay-off to him; Id. at p. 13; and

(13) False and unfounded statements damaging to Plaintiff were posted on the CRW website at some unspecified time; Id. at pp. 13-14.

Other than the mention of Lewis-Wolfram in conjunction with alleged past conduct, there are no allegations against her. There are no allegations against McNeel (other than being one of several Defendants named in the caption of the malicious prosecution claim), and there are no allegations against Stratton, Jensen, or Anderson. There is also no allegation of any alleged speech made by Plaintiff to form the basis of a First Amendment retaliation claim.

II.  The First Amendment Claim

As I explained in my December 9, 2014 Order adopting Judge Acosta's recommendation to dismiss Plaintiff's First Amended Claim and to deny Plaintiff's previous motion for leave to file a second amended complaint, the First Amendment claim in this case is potentially governed by Blair v. Bethel School District, 608 F.3d 540 (9th Cir. 2010). Dec. 9, 2014 Ord., 2014 WL 6998084, at **4-6 (D. Or. Dec. 9, 2014). Blair and similar cases make clear that even when there is no dispute that a plaintiff engaged in protected speech and suffered retaliatory action as a

result, the issue of whether a defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity is analyzed differently when the First Amendment retaliation claim arises in the context of the political arena.  Blair, 608 F.3d at 544 ("The peculiar context in which Blair's case arises distinguishes it from the ordinary case in three crucial ways"). While Blair itself did not announce a unique analysis for such claims, it suggested that when the alleged retaliatory conduct is part of the "ordinary functioning of the democratic process," the "regular functioning of the political process," the game of "political hardball," is a "[d]isagreement endemic to politics . . . [which] naturally plays out in how votes are cast," or is based on a vote by a fellow elected official of the same body, the alleged retaliatory conduct does not support a First Amendment claim.  Id. at 544-46.

    The Blair court distinguished Bond v. Floyd, 385 U.S. 116 (1966).  Id. at 545 n.4.  In Bond, the Georgia House of Representatives blocked the newly elected plaintiff from taking office because of his position against the Vietnam War which the legislative body contended was inconsistent with the oath of office's requirement that the plaintiff support the Constitution.  As the Blair court noted, the refusal to seat the plaintiff had the effect, "deleterious to democracy, of nullifying a popular vote[,]" namely the election of the plaintiff to office.  Id. (citing Bond, 385 U.S. at 118).  The Blair court explained that had the school board in Blair voted the plaintiff off the school board entirely or had somehow deprived him of the authority he enjoyed by virtue of his popular election, Blair would be a different case.  Id.  Unlike Bond, the retaliatory action against the plaintiff in Blair, stripping him of a leadership position, did not affect his ability to perform the duties of his elected position.

    As I explained in my December 9, 2014 Order, most of the allegations against CRW in

8 - OPINION & ORDER

Plaintiff's then-controlling First Amended Complaint appeared to target actions taken by CRW pursuant to a majority vote of its Commissioners.  Dec. 9, 2014 Ord., 2014 WL 6998084, at *6 n.4.  Applying <u>Blair</u>, I concluded that Plaintiff could not maintain a claim against CRW as a municipal corporation for such actions because those actions were the result of the ordinary give and take of the political process.  <u>Id.</u> at *6.  Even if certain votes were taken out of spite, the actions of CRW based on a majority vote of its members did not support a First Amendment retaliation claim brought by one of its elected members.  <u>Id.</u>; <u>see also</u> <u>Blair</u>, 608 F.3d at 546 ("'a legislative body does not violate the First Amendment when some members cast their votes in opposition to other members out of political spite or for partisan, political, or ideological reasons.'") (quoting <u>Zilich v. Longo</u>, 34 F.3d 359, 363 (6th Cir. 1994)).

Similarly, as I explained in my December 9, 2014 Order, any allegations against individual Commissioners which targeted conduct occurring "in their capacity as publicly elected commissioners" were also inappropriate bases for a First Amendment claim if the conduct was part of the regular democratic political process, even if such conduct was retaliatory or spiteful. Dec. 9, 2014 Ord., 2014 WL 6998084, at **4-6.  Thus, I dismissed with prejudice the First Amendment retaliation claim to the extent it was based on the actions of CRW and its "publicly elected commissioners taken in their official capacity." <u>Id.</u> at *6.

In reviewing Judge Acosta's October 2, 2015 Findings & Recommendation, it appears that my December 9, 2014 Order could have been more clear in referring to Plaintiff's inability to "maintain her First Amendment retaliation claim against CRW in its capacity as a municipal corporation, and against CRW's commissioners in their capacity as publicly elected commissioners." <u>Id.</u>  As Judge Acosta notes, despite <u>Bond</u> and <u>Blair</u>, the cases provide no test

or analysis "to determine when an elected-official plaintiff may pursue a First Amendment retaliation claim on the basis of actions taken by legislative actors."  Oct. 2, 2015 F&R at 10.  My references to "capacity as a municipal corporation" and "capacity as publicly elected commissioners" were, essentially, shorthand descriptions for retaliatory conduct springing from the dynamic, boisterous, hardball political process and which does not deprive the elected-official plaintiff of his or her ability to perform the functions of the elected office.  By precluding Plaintiff from basing her claim on conduct by the Commissioners in their capacities as publicly elected officials, I precluded Plaintiff from basing her claim on Commissioners' conduct made in the context of the political process, including votes by Commissioners which might be retaliatory but which did not deprive Plaintiff of her ability to perform as an elected Commissioner herself.  By precluding Plaintiff from basing her claim on conduct alleged against CRW "in its capacity as a municipal corporation," I precluded Plaintiff from basing her claim on conduct by CRW which it executed as a result of the majority vote of its Commissioners.

 By using the phrases "municipal corporation,""capacity as publicly elected commissioners" or "official capacity" I was not referring to the distinction made in Kentucky v. Graham, 473 U.S. 159 (1985), between claims brought against individuals in their official capacities versus their individual capacities.  The phrase "acting in their official capacities" refers to "to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the injury."  Hafer v. Melo, 502 U.S. 21, 26 (1991).  The Hafer court explained that

> official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent. . . . . Personal capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law. . . . State officers sued for damages in their official capacity are not "persons" for purposes of the suit because they assume the

identity of the government that employs them. . . .  By contrast, officers sued in
their personal capacity come to court as individuals.

Id. at 25, 27 (internal quotation marks and citations omitted).

The Ninth Circuit has stated that

> "Personal-capacity suits seek to impose personal liability upon a
> government official for actions he takes under color of state law....
> Official-capacity suits, in contrast, generally represent only another
> way of pleading an action against an entity of which an officer is an
> agent. . . . As long as the government entity receives notice and an
> opportunity to respond, an official-capacity suit is, in all respects
> other than name, to be treated as a suit against the entity.... It is not
> a suit against the official personally, for the real party in interest is
> the entity."

Community House, Inc. v. City of Boise, 623 F.3d 945, 966-67 (9th Cir. 2010) (quoting

Kentucky v. Graham, 473 U.S. 159, 165-66  (1985)).

Because of my use of the terms "official capacity" and the like, Judge Acosta concluded

that Plaintiff's Section 1983 claim against CRW and Defendants was foreclosed to the extent it

was brought against them in their official capacities but that Plaintiff could pursue her claims

against the Defendants in their individual capacities. Oct. 2, 2015 F&R at 9.  This statement is

incorrect.  First, the official capacity versus individual capacity distinction does not apply to an

entity such as CRW.  Second, my Order did not intend to instruct Plaintiff as to whether to sue

the individual Defendants in their official or individual capacities under Kentucky v. Graham.

Rather, as suggested in Hafer, my reference was not to the capacity in which the individual

Defendants were sued, but the capacity in which their alleged conduct occurred.

Furthermore, my imprecise phrasing led Judge Acosta to erroneously conclude that

Plaintiff was precluded from bringing a Monell claim against CRW.  Oct. 2, 2015 F&R at 8.  In

fact, I did not consider one way or the other whether Plaintiff could bring a Monell claim. I intended to dismiss with prejudice Plaintiff's First Amendment claim against CRW to the extent it was based on actions CRW took as a result of a majority vote of its Commissioners. A Monell claim alleges that a municipality is liable for a constitutional violation because of a custom, policy, or practice that can be attributed to the municipality. Delia v. City of Rialto, 621 F.3d 1069, 1081 (9th Cir. 2010) (citing Monell, 436 U.S. at 690-91 (holding that a municipality is a "person" subject to damages liability under section 1983 where it has caused a constitutional tort through "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.")), rev'd on other grounds 132 S. Ct. 1657 (2012).

In Monell, the Court specifically rejected the use of the doctrine of respondeat superior to hold a municipality liable for the unconstitutional acts of its employees. Monell, 436 U.S. at 694. Rather, municipalities may be held liable only when an injury is inflicted by a city's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy[.]" Id. Additionally, while in some instances a single decision may subject a municipality to Section 1983 liability, such liability "attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986).

Here, Plaintiff asserts a Monell claim against CRW as part of her First Amendment claim. PSAC at p. 14. She alleges that CRW is liable because its chief executive officer, whom she previously identified as Moore, formulated "the policy" under Monell. Id. She further alleges that these policies were not part of any formal "legislative proceedings, but were adopted on an ad hoc basis in secret meetings of the conspirators, which precludes any of the corrupt decisions

from characterization as legislative acts." Id. at p. 15.  My December 9, 2014 Order made clear that any claim against CRW may not be based on actions it took pursuant to a majority vote of the Commissioners.  Plaintiff's currently pleaded proposed Monell claim in the PSAC suggests that whatever "policy" she alleges motivated unspecified CRW actions, such policy was not adopted as part of formal "legislative" proceedings.  As such, her allegation appears consistent with my December 9, 2014 Order.  Nonetheless, the claim fails to state a claim because it does not identify the alleged policy at issue or allege facts showing that specific actions were taken by those "whose edicts may fairly be said to represent official policy" or by a decisionmaker who possesses final authority to establish municipal policy with respect to the alleged actions taken.

Against this backdrop, I examine the allegations in the PSAC.  Plaintiff concedes in the PSAC that the decision to cancel the liability and legal defense insurance and the "decision to set aside bribe and kickback funds for payment to defendant Voyles," were the subjects of Commissioner votes in a public legislative session.  PSAC at p. 5 ("Except for the corrupt decision to cancel liability and legal defense insurance, and the decision to set aside bribe and kickback funds for payment to defendant Voyles, none of the actions were based on any public voting during any public legislative sessions.").  Thus, based on the law as articulated in Blair and related cases, and explained in my December 9, 2014 Order, Plaintiff's First Amendment claim cannot be based on these actions.

Omitting those allegations, Plaintiff's PSAC contains the following allegations specific enough to articulate here:

(1) In October 2011, Kehoe, Kemper, Cardwell, Moore, and Phillips made a decision to have Moore and Voyles file employment-related complaints against Plaintiff and agreed that

Phillips would guide Moore in filing that complaint;

(2) at some unspecified date before October 2011, SDAO delayed responding to Plaintiff's requests for legal defense and denied coverage for complaints before insurance coverage was restricted;

(3) On November 7, 2011, Voyles filed a BOLI complaint against Plaintiff (presumably, this is the complaint referred to as having been the subject of the October 2011 decision);

(4) In December 2012, Moore filed a tort claim notice against Plaintiff.  It is unclear if this is related to the October 2011 decision to have Moore file an employment-related complaint against Plaintiff;

(5) At some unspecified point in time, Phillips and Moore "took charge of SDAO negotiations," notifying Plaintiff that SDAO had denied coverage;

(6) At some unspecified point in time, Phillips and Moore hired Leachman to conduct an "investigation" and in February 2012, unspecified "Defendants" secretly communicated with Leachman to fabricate a fraudulent report intending to inflict financial harm against Plaintiff; Phillips allegedly edited the Leachman report which was fraudulent;

(7) "CRW" tried to settle Voyles's BOLI complaint as to CRW shortly after March 20, 2012; approximately one year later when Voyles threatened to file a civil suit over the same allegations, Humberston and Kalani agreed with Moore and Phillips to "pay-off" Voyles which allegedly occurred in December 2013 after Voyles dismissed the lawsuit he had filed;

(8) In June 2014,[4] after the original Complaint in this case was filed, Sowa, Humberston,

_____

[4]  It's possible Plaintiff meant June 2013 instead of 2014 if this "slush fund" money was intended to fund the "pay-off" to Voyles.

and Kalani established a $75,000 risk-management "slush" fund; and

(9) False and unfounded statements damaging to Plaintiff were posted on the CRW website at some unspecified time.

Many of these allegations are still vague and as a result, it is unclear whether <u>Blair</u> prevents them from being actionable as a basis for Plaintiff's First Amendment claim. For example, what was the context in which Kehoe, Kemper, and Cardwell allegedly made a decision to have Moore and Voyles file employment-related actions against Plaintiff? Were they acting as CRW Commissioners? Was this the subject of a vote by the Commissioners? What was the context of the decision by Sowa, Humberston, and Kalani to allegedly establish a "slush-fund"? Were they acting as CRW Commissioners? Was this the subject of a vote by the Commissioners? Is this the "decision to set aside bribe and kickback funds for payment to defendant Voyles," that Plaintiff concedes was the subject of a public vote by CRW? Additionally, was the $40,000 paid to Volyes after his voluntary dismissal of his civil lawsuit, the subject of a vote by the CRW Commission? If so, it is subject to <u>Blair</u>'s reasoning and not a basis for the First Amendment retaliation claim.

It is not enough for Plaintiff to allege that "[n]one of these defendants' activities were legislative actions." PSAC at p. 5. This is an assertion of a legal conclusion, not an assertion of the facts upon which the legal conclusion may be made. It is also not enough to allege that all of Defendants' actions were "outside of their duties as public officials." <u>Id.</u> at p. 3. Again, this is a legal conclusion, not an assertion of facts upon which the legal conclusion may be made. As legal conclusions, these are not accepted as true in analyzing whether allegations state a claim. <u>Holden v. Hagopian</u>, 978 F.2d 1115, 1121 (9th Cir. 1992) (the court need not accept conclusory

allegations as truthful).

Judge Acosta accurately captured the factors relevant to a First Amendment retaliation claim by an elected-official Plaintiff on the basis of actions taken by legislative actors. Oct. 2, 2015 F&R at 10-11. However, he erroneously relied on facts asserted in pleadings other than the PSAC. Nonetheless, I agree with him that some of Plaintiff's claims could possibly state a claim. For example, if certain Commissioners caused Voyles to file his BOLI complaint against Plaintiff, it could be argued that such conduct would deter a reasonable person from further First Amendment activity. Additionally, such a complaint could result in liability by Plaintiff for damages. And, it is possible, although not clear from the current allegations, that such Commissioners' actions were not part of the give and take of hardball politics in the context of the political process but were independent and outside of that process.

While Judge Acosta's analytical framework is sound, he did not dissect the allegations in the PSAC from those in other pleadings. And, he failed to distinguish among actions taken by current or former Commissioners on the one hand and those employed by the CRW or not connected with CRW in any way, on the other hand. Finally, while he noted the necessity of evaluating whether the alleged conduct prevented Plaintiff from performing the necessary functions of her elected office, he disregarded its importance in the analysis. Bond instructs, as the Blair court noted, that "the retaliatory acts of elected officials against their own" can violate the Constitution when those acts effectively deprive the elected official of the "authority he [or she] enjoy[s] by virtue of his [or her] popular election." 608 F.3d at 545. n.4. Judge Acosta noted that the unspecified "complaint" did not make clear whether Plaintiff was prevented from performing the necessary functions of her elected office. Oct. 2, 2015 F&R at 12. But, he

16 - OPINION & ORDER

concluded, even if Defendants' actions had no effect on her job duties, the other factors weighed in her favor and thus, her First Amendment claim was not foreclosed by <u>Blair</u>.

The PSAC, the only pleading to be examined, alleges that the certain actions "barred" Plaintiff of her free speech rights, damaged her professional reputation in the community, damaged her personal reputation, and were taken in retaliation for her speech with the intent of inflicting financial damage on her. <u>E.g.</u>, PSAC at pp. 5, 6, 7, 8, 9. Rather than being unclear, there are <u>no</u> allegations whatsoever that the alleged actions affected Plaintiff's ability to perform the functions of her elected office. If Plaintiff's elected-office functions were unimpeded by the alleged actions, those actions may have less of a chilling effect. Because so many of the allegations are conclusory and vague, it is impossible to analyze the effect of the alleged retaliatory actions. Thus, under the current PSAC, I cannot conclude that Plaintiff states a claim under <u>Blair</u> without alleging that the retaliatory conduct deprived her of her authority as a CRW Commissioner.

Plaintiff's allegations against the current or former Commissioners are so poorly drafted and the omissions of the who, what, and when so significant that the Court simply cannot assess whether Plaintiff's claims against the Commissioner Defendants state a claim under <u>Blair</u>. Thus, while it is possible that she could state a claim consistent with my December 9, 2014 Order and this Opinion and Order, the futility of her claims against her fellow Commissioners is not certain one way or the other. Moreover, as Judge Acosta noted, Plaintiff fails to include allegations regarding the alleged protected speech at issue. Oct. 2, 2015 F&R at 13 (noting conclusory allegations which do not state facts putting Defendants on notice of the protected speech and conduct at issue).

17 - OPINION & ORDER

Putting aside the allegations against the individual past or present CRW Commissioners which are subject to <u>Blair</u>, the unique political context at issue in <u>Blair</u> does not apply to the claims against the CRW employees or non-CRW Defendants.  Thus, <u>Blair</u> does not impact the claims against Moore, the CRW Chief Executive, Phillips, legal counsel for the "District," and Voyles, identified only as an "employee" of CRW.  Similarly, <u>Blair</u> does not apply to the claims against SDAO, its employees, or Leachman.  The allegations unaffected by <u>Blair</u> and not otherwise precluded are: (1) SDAO delayed a response to a request for legal defense and then denied coverage for a complaint filed before coverage was terminated; (2) Volyes filed a BOLI complaint against Plaintiff; (3) Moore filed a tort claim notice against Plaintiff; (4) Phillips and Moore took charge of the SDAO negotiations[5]; (5) Phillips and Moore hired Leachman and Phillips edited the Leachman report which was fraudulent; and (6) false statements were posted on the CRW website.[6]  While these allegations are not subject to <u>Blair</u>,[7] Plaintiff still fails to state a First Amendment retaliation claim based on these allegations because of her failure to allege the specifics regarding her allegedly protected speech.

/ / /

---

[5]  It is unclear how Phillips's and Moore's allegedly "taking charge" of SDAO negotiations was harmful when Plaintiff concedes the decision to cancel the liability and legal defense coverage was the subject of a CRW Commission public vote and which, as explained above, cannot form the basis of a First Amendment retaliation claim by a member of the Commission.

[6]  The allegations regarding the information on the CRW website could be subject to <u>Blair</u> depending on the circumstances of the posting.

[7]  First Amendment retaliation cases with a public employee Plaintiff are not controlling against these Defendants because Plaintiff was not an employee.  Thus, <u>Garcetti v. Ceballos</u>, 547 U.S. 410 (2006) remains inapplicable.  Instead, as <u>Blair</u> teaches, the three-part test for "typical" First Amendment retaliation claims applies to the non-Commissioner and non-CRW Defendants. <u>Blair</u>, 608 F.3d at 543.

II.  RICO Claims

Judge Acosta concluded that Plaintiff failed to state civil RICO claims because she did not adequately allege standing.  He correctly stated that to show standing, Plaintiff must allege that she suffered harm to a specific business or property interest and that such harm be concrete and protected as a property interest under state law.  Oct. 2, 2015 F&R at 14.  He analyzed five separate types of harm Plaintiff allegedly suffered:  attorney's fees, injury to reputation, loss of future employment prospects, loss of prospective clientele in her real estate career, and lost income from diverting productive and income-producing activity to defending against Defendants' "sham" lawsuits and administrative complaints.  Id. at 15.  Judge Acosta first concluded, consistent with his earlier conclusion which I previously adopted in my December 9, 2014 Order, that legal fees expended to defend against "sham"lawsuits do not amount to injury to business or property interests sufficient to confer standing to bring a civil RICO claim.  Id.  Next, he rejected an alleged injury to reputation as the type of concrete harm to a business or property interest in support of civil RICO standing.  Id. at 15-16 (citing Bowen v. Oistead, 125 F.3d 800 (9th Cir. 1997)).

Judge Acosta discussed the remaining three alleged injuries under the heading of "Loss of Business Opportunities."  Id. at 16-19.  He noted Plaintiff's allegation that she was deprived of $150,000 in lost income while she defended against the "sham" lawsuits, her allegation that Defendants' actions damaged her future employment prospects, and her allegation that Defendants' actions caused her to lose future, prospective clientele.  Id. at 16.  Judge Acosta cited Ninth Circuit law rejecting injuries to hypothetical economic prospects as compensable "business or property" interests under RICO.  Id. (citing Oscar v. Univ. Students Co-Op. A'ssn., 965 F.2d

19 - OPINION & ORDER

783, 785-86 (9th Cir. 1992); <u>Berg v. First State Ins. Co.</u>, 915 F.2d 460, 464 (9th Cir. 1990)).

But, as he discussed, a 2005 Ninth Circuit case concluded that prospective property rights could be recoverable in civil RICO cases where state law recognizes the alleged injury as harm to a business or property right. <u>Id.</u> at 17 (discussing <u>Diaz v. Gates</u>, 420 F.3d 897, 900-01 (9th Cir. 2005)). Judge Acosta applied <u>Diaz</u>, discussed the elements of the tort of interference with a business relationship and interference with a prospective business relationship, and concluded that the allegations failed to assert certain elements for those torts. <u>Id.</u> at 17-19 (noting that Plaintiff failed to allege an existing employment relationship and that it was unclear if she had an existing employment or business relationship that she was forced to terminate so she could defend herself; further noting she failed to allege facts showing a prospective business relationship rather than a merely hypothetical one). Accordingly, because Plaintiff failed to allege any cognizable injury to a business or property interest, Judge Acosta concluded that her PSAC fails to state a civil RICO claim .

## III.  State Law Claims

Because Defendants made no separate arguments against the intentional infliction of emotional distress (IIED) or malicious prosecution claims, Judge Acosta did not analyze the futility of those claims as they were currently pleaded in the PSAC. Oct. 2, 2015 F&R at 19. Instead, he declined to allow the motion for leave to file the PSAC having concluded that the federal law claims were futile. This Court previously adopted Judge Acosta's recommendation in his September 9, 2014 F&R that the IIED claim be dismissed on the merits as it was based on the filing of an OGEC complaint, a BOLI complaint, and two civil cases, none of which constituted a cognizable action transgressing the bounds of socially tolerable conduct. Dec. 9, 2014 F&R at

15.  The allegations in support of the IIED claim in the PSAC are fairly unspecific and conclusory.  Plaintiff asserts that unspecified Defendants made false accusations and that Defendants' actions accused her of criminal conduct and ethical violations.  PSAC at p. 16.  To the extent the unspecified "actions" referred to are the filing of the OGEC complaint, the BOLI complaint, or the civil actions against her, they have already been dismissed as a basis for the IIED claim.

IV.  Unserved Defendants & New Defendant McNeel

In my December 9, 2014 Order, I adopted Judge Acosta's recommendation that the motion to dismiss for failure to serve process on certain Defendants be granted.  Dec. 9, 2014 Ord. at 14-15.  This order applied to Defendants Sowa, Humberston, Kalani, SDAO, Stratton, Jensen, Anderson, and Leachman.

In the October 2, 2015 F&R, Judge Acosta noted Defendants' argument that Plaintiff "failed to comply with the court order dismissing her claims against the 'unserved defendants,' which the court has already dismissed for lack of service."  Oct. 2, 2015 F&R at 19.  Judge Acosta further remarked that Plaintiff "conceded" that the unserved Defendants should not have been named in the "caption"but argues that the court should not permanently foreclose her from naming them as defendants in the future.  Judge Acosta recommended that the unserved Defendants be struck from the case caption, with leave to rename them and without prejudice to any defenses Defendants can assert.

In their response to Plaintiff's Motion for Leave to Amend, Defendants argued that the unserved Defendants were "permanently dismissed from the case."  Defs.' Resp. at 8.  However, when a defendant is not served within 120 days after the complaint is filed, the dismissal is

"without prejudice against that defendant or order that service be made within a specified time."

Fed. R. Civ. P. 4(m)[8] (emphasis added); Mongeon v. City of Portland, No. 03:13-cv-2013-ST,

2015 WL 5129561, at *5 (D. Or. July 2, 2015) ("Dismissal under FRCP 4(m) is 'without

prejudice' to a plaintiff's right to re-file"; further noting that "this arguably does not toll any

statute of limitations that might have run in the interim"), adopted as modified, 2015 WL

5130254 (D. Or. Sept. 1, 2015).

Thus, the previous dismissal of the unserved Defendants was not "permanent" in the

sense that Plaintiff can add them to an amended pleading if she desires to do so.  Judge Acosta

properly concluded that the unserved defendants should be stricken from the current case caption

but that Plaintiff may name them in a subsequent proposed amended pleading.

In their opposition to Plaintiff's motion, Defendants also argued that any claims against

McNeel should be dismissed because he was a "new" Defendant.  Judge Acosta properly

concluded that although Plaintiff did not name McNeel in her prior complaints, she was not

precluded from adding or removing defendants through amendment and thus, McNeel could be

named in the PSAC.

I note, however, that other than the presence of McNeel's name in the caption of the

malicious prosecution claim, there are no allegations against him in the PSAC.  Even aside from

any other reason to deny Plaintiff's motion for leave to amend, the PSAC fails to state any claim

against McNeel.

/ / /

---

[8] Absent Congressional action, Rule 4(m) will allow 90 days for service beginning
December 1, 2015.

V.  Plaintiff's Objections

Plaintiff's initial objection regarding the distinction between Defendant employees and Defendant elected officials is addressed above, as is Plaintiff's objection that <u>Kentucky v. Graham</u> does not provide a basis for dismissal.

As to the RICO claim, Plaintiff objects to the conclusion that the attorney's fees she spent in defending against "sham" lawsuits is not a cognizable business or property interest sufficient to confer civil RICO standing.  This Court already adopted the same conclusion in its December 9, 2014 Order.  Dec. 9, 2014 Ord, 2014 WL 6998084, at *8 (agreeing with Judge Acosta's analysis of Plaintiff's RICO claim to the extent that he addressed Plaintiff's business interest in being a Commissioner and her expenditure of thousands of dollars in legal fees to defend against sham lawsuits and administrative complaints); <u>see</u> <u>also</u> Sept. 9, 2014 F&R at 16-17 (finding that the Ninth Circuit would not likely conclude that the incurment of legal fees is a cognizable injury under RICO).  As Judge Acosta noted in the October 2, 2015 F&R, there is no compelling reason to depart from the prior conclusion.  I agree.[9]

I also agree with Judge Acosta that "injury to reputation" does not qualify as a compensable injury under RICO.  And, I agree with Judge Acosta's analyses as to Plaintiff's three "business opportunity" injuries:  her alleged financial loss of future employment prospects, loss of prospective clientele in her real estate career, and lost income caused by diverting productive and income-producing activity to defending against the alleged sham lawsuits and administrative complaints.  Plaintiff's objections to these conclusions are overruled.

---

[9]  Moreover, as Judge Acosta noted in the September 9, 2014 F&R, filing of "sham" lawsuits has not been not recognized as "racketeering activity" under RICO and thus, such filings cannot be the proximate cause of the injury.

Plaintiff also argues that she otherwise states a claim.  She relies, however, on allegations from her First Amended Complaint, her previously Proposed Second Amended Complaint submitted to the Court in March 2014, her currently proposed PSAC, and her Memorandum in Support of her Motion for Leave to File the PSAC.  As made clear above, only the allegations contained in the PSAC are relevant in determining whether Plaintiff states a claim.  Judge Acosta accurately noted that Plaintiff's allegations are conclusory and at least in regard to her First Amendment claim, do not state facts putting Defendants on notice of what speech and conduct as at issue.

Moreover, my review of the PSAC indicates that it is replete with vague and conclusory allegations.  As mentioned previously, there are many references to "Defendants" or the "conspirators" collectively without specifying which fifteen individual or two entity Defendants Plaintiff refers to.  E.g., PSAC at p. 6 ("defendants are culpable parties"); at 8 "("defendants negotiated with defendant SDAO"); at 16 ("Defendants made false accusations against the Plaintiff").  There are also, as previously noted, conclusory allegations that fail to recite relevant facts.  E.g., id. at 3 ("[a]ll of the defendants' actions complained of were tortious . . . and outside of their duties as public officials"); at 3-4 ("None of the actions complained of were legislative acts").

Additionally, among other issues is the failure of the PSAC to raise a Monell claim against SDAO which appears to be a named Defendant in the First Amendment claim.  No allegations giving rise to a Monell claim against SDAO are pleaded in the PSAC.  And, there are no allegations whatsoever against any of the three individuals alleged to be employees of SDAO.  Thus, the PSAC fails to state a First Amendment claim against SDAO or any claim against

Stratton, Jensen, and Anderson.

Finally, as Judge Acosta noted, Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements apply to civil RICO claims based on a pattern of fraud. Oct. 2, 2015 F&R at 19 n.2. Thus, Plaintiff must state allegations in support of those claims with more particularity than is otherwise required.

In summary, the PSAC fails to state claims against Defendants because it is conclusory, vague, fails to raise any allegations against certain Defendants, and/or otherwise fails to state viable claims. Plaintiff's objections regarding the sufficiency of the PSAC are without merit.

## VI. Dismissal With or Without Leave to Amend

Judge Acosta recommends that the motion for leave to amend be denied, but that Plaintiff be given leave to try again because it is possible she can state First Amendment retaliation claims consistent with Blair and can allege cognizable business and property harm sufficient to confer civil-RICO standing. Judge Acosta notes in a footnote, however, that after filing her original Complaint, Plaintiff filed an Amended Complaint as of right in November 2013, which was dismissed as inadequately pleaded and that her two motions for leave to amend have now been denied. Oct. 2, 2015 F&R at 20 n.3. Judge Acosta warned Plaintiff that failure to cure the deficiencies discussed in the October 2, 2015 Findings & Recommendation could result in dismissal of the case with prejudice. Id. (citing Moore v. Kayport Package Exp., Inc., 885 F.2d 531, 537-38, 542 (9th Cir. 1989)).

I agree with Judge Acosta that leave to amend should be granted. But, I also join in his observation that Plaintiff has now tried four times to state her claims and has failed to put forth viable claims in her Amended Complaint, in her first proposed second amended complaint, and

in the PSAC.[10]  A plaintiff is not given an unlimited number of times to amend.  At some point,

the repeated failure to set forth facts to establish a viable claim supports the denial of a motion

for leave to amend without leave to refile.  E.g., Salameh v. Tarsadia Hotel, 726 F.3d 1124, 1133

(9th Cir. 2013) (district court did not abuse discretion in denying leave to amend when the

plaintiffs had "ample opportunity to properly plead a case and have failed to do so" and the

plaintiffs previously failed to follow specific instructions from the court on how to amend the

complaint).  Going forward, Plaintiff must find a balance between the previously excessive 111-

page proposed complaint that I described as "poorly organized" and "repetitive" and the current

PSAC which fails to contain sufficient allegations to state a claim.  Plaintiff must pay particular

attention to complying with Rule 9(b) regarding her RICO claims and to avoiding conclusory

allegations which add nothing to the facts required to put Defendants on notice of the claims

against them.  Both the quantity and, for lack of a better word, the quality of allegations need

attention.  Among other things, Plaintiff should make clear which Defendants did what and

when, which Defendants are named in a particular claim, when the individual CRW

Commissioner Defendants were Commissioners, and the basis for SDAO liability on any given

claim.

/ / /

/ / /

/ / /

/ / /

---

[10]  Because Plaintiff amended her original Complaint as of right, its sufficiency was never
tested.

CONCLUSION

The Court ADOPTS Magistrate Judge Acosta's Findings & Recommendation [55], and therefore, Plaintiff's Motion for Leave to Amend [49] is denied.  Plaintiff has 30 days from the date of this Order to seek leave to amend her claims.

IT IS SO ORDERED.

DATED this _____25_____ day of ___Nov.____, 2015.


_____
MARCO A. HERNANDEZ
United States District Judge

27 - OPINION & ORDER